[No. 1145-2. Division Two. May 9, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL WEST-LUND *et al, Appellants.*

*Edward G. Holm,* for appellants.

*Byron E. McClanahan, Prosecuting Attorney,* and *William Britton, Special Deputy,* for respondent.

ARMSTRONG, C.J.—This is a case of arrest by combat. At least, that is what resulted when the arrestee refused to permit the police to place handcuffs on him and two members of a hostile crowd came to his assistance while the police were forcing him to submit to the use of handcuffs. The results of resisting arrest by the arrestee and his friends graphically demonstrate the physical hazards that can face those resisting arrest, as well as the danger to police officers.

By separate informations each of the defendants, Michael Westlund, John Vonhof and Richard Adams was charged with second-degree assault in that each, "with intent to resist and prevent the lawful apprehension or detention of himself or another person, did assault with his hands and fists"—individually identified police officers.[1] They were all tried together, and by jury verdict, each was convicted of

---

[1] In addition, the information charged Vonhof with second-degree assault by inflicting grievous bodily harm upon a trooper of the Washington State Patrol.

third-degree assault under an instruction (to which no error has been assigned), which permitted the conviction if the jury found beyond a reasonable doubt that each did willfully and unlawfully assault the identified officers. Westlund's primary defense was that he merely acted in self-defense when excessive force was used by the officers who attempted to effect his arrest. Vonhof's primary defense (and so also apparently is Adams') was that he merely acted in defense of Westlund against whom excessive force was being used. All three defendants have appealed. They contend they were deprived of the opportunity to effectively argue their respective theories of defense in that the jury was improperly instructed as to the law of self-defense and because no instruction was given as to the law of defense of another. Additionally, they contend the trial court erroneously permitted introduction of inflammatory and irrelevant evidence at the trial which, they contend, was conducted in a "circus type of atmosphere," where police officers took pictures of witnesses and spectators in the hallway of the courthouse.

The uncontroverted facts are that on Saturday, May 2, 1972, in an area called Sunset Beach, along Hood Canal in Mason County, Westlund had a party at his residence for a large group of persons. At least some of those in attendance were minors although most appear to have been young adults.

Westlund provided a keg of beer and several bottles of wine. Westlund indicated he had been drinking beer from the time he set the keg in position at about 10 a.m. One defense witness, who was with him when the police encounter began at about 6 p.m., described Westlund as not being "falling down drunk," but that "he had quite a bit to drink."

The contact with police authorities began when a trooper from the Washington State Patrol, investigating a hit-and-run accident, found the suspect car near the Sunset Beach store. Westlund, a large man, who was leaving the store at

about that time with a guest, appeared to the trooper to fit the reported description of the driver of the hit-and-run vehicle. The trooper asked Westlund for some identification, which Westlund had at his residence. At about that time several deputy sheriffs arrived at the scene. Two officers went to the Westlund residence where he produced identification satisfactory to the officers. While at the residence, however, they saw a crowd of young people, some of whom they identified as minors drinking beer. Defense witnesses estimated the size of the group at Westlund's residence at between 50 and 60 people.

The officers left, but believing the driver of the hit-and-run vehicle was at the residence, told Westlund to produce him in 10 minutes at which time they would return. Westlund contends the officers said they would break up the party if the driver was not produced. The officers contend they told Westlund simply that they would impound the hit-and-run vehicle. Westlund testified, "I told them if they were going to come back to bring a search warrant, if they were going to come on the property."

About that time the driver's wife appeared and the officers and the driver's wife left the Westlund property. Westlund indicated that "things got tense" when the officers told him to produce the driver. The record does not reflect how, when, or where the driver was ultimately presented to the officers. He was, however, arrested.

As promised, two deputy sheriffs returned to Westlund's property and placed Westlund under arrest. The officers testified that Westlund was told he was under arrest for contributing to the delinquency of a minor. Westlund said he does not remember but it is possible he was so told. He does remember that immediately thereafter two more officers appeared and all four officers and he started toward the road.

Westlund's version of the events following his arrest begins: "I remember the one on this side had pulled my arm down and put a handcuff on it and I looked at him and I

said, 'I'll go peacefully.'" One defense witness, who described herself as "a very good friend" of Westlund, when asked whether he was resisting during the initial moments of the arrest, responded, "No, he wasn't fighting them or anything. He was dropping his hands and trying to keep them from trying to grab a hold of him."

Vonhof, who witnessed the arrest, said that he saw the officers had a handcuff on Westlund's left hand, "but he stiffened his arms out and wouldn't permit them to bend his right arm behind his back." Another defense witness, a guest at the party, indicated that initially Westlund "was resisting having his arms forced behind his back." However, after one handcuff was placed, the witness saw Westlund's other arm go stiff, one of the officers struck it with a hard blow, and all of the group then fell to the ground in the middle of the road. Westlund indicated that three or four of the officers were on top of him. The situation deteriorated to the point where it ended up in a big commotion in the middle of the road.

At that point Vonhof and Adams entered into the affray. Vonhof disengaged a trooper from the melee; Adams was able to remove a deputy sheriff. Adams did not testify. We cannot specify what he saw or precisely why he became involved. However, when asked why he became engaged in the fighting, Vonhof said; "I was stopping them from beating him up after they had already been beating him up for maybe 10, 15 seconds."

Ultimately, all three defendants were subdued and arrested, but not without considerable escalation in the ferocity of the police. Seven deputy sheriffs and three troopers became active participants. Two officers acknowledged using sap gloves; a bystander said he unmistakably saw an officer use a sap; another officer acknowledged that he later "maced" Westlund; several other officers seized a camera from a bystander, exposed the film, and threatened to arrest the owner for littering when he threw the exposed film on the ground. Westlund's face was described as looking

like hamburger; he was spitting blood extensively. Ferocity was not limited to the police. One trooper sustained a concussion, required hospital care, and experienced a protracted period of recuperation. Rocks were thrown by several bystanders. Two police cars sustained considerable damage.

We have deliberately summarized the facts in a light most favorable to Westlund and the other two defendants in order to determine whether they were deprived of the right to present their respective defenses effectively to the jury. Concerning Westlund's use of force as self-defense, the jury was instructed, in relevant part, in instruction No. 16:

> If you find that the force used by law officers at the time of arresting MICHAEL JAMES WESTLUND was excessive, then if you further find that MICHAEL JAMES WESTLUND was about to be seriously injured, you are instructed that defendant MICHAEL JAMES WESTLUND had the right to defend himself and to resist the excessive force and prevent serious injury with force reasonable and proportioned to the injury attempted upon him.

The jury was given no instruction on the issue of the right of third persons to come to the aid of another being unlawfully arrested.

The law in the state of Washington has been that one may resist an *unlawful* arrest by an amount of force reasonable and in proportion to the injury the arrestee faces. *State v. Rousseau*, 40 Wn.2d 92, 241 P.2d 447 (1952); *State v. Schulze*, 51 Wn.2d 878, 322 P.2d 839 (1958); *State v. Eckman*, 9 Wn. App. 905, 515 P.2d 837 (1973). The right of a third party to go to the aid of one being lawfully or unlawfully arrested has not been discussed in the case law of Washington.

There is no challenge on appeal to the legality of the initial arrest. This was clearly a case of lawful arrest for contributing to the delinquency of minors. Minors were present at the party and a trooper observed one person known to him to be 16 years of age holding a beer bottle.

Rather, we are faced here with an assertion that excessive force was used in accomplishing a lawful arrest. The court in essence, charged the jury that Westlund had the right to defend himself and resist excessive force if he was *about to be seriously injured*. Defendants seek to extend the rule of *State v. Miller*, 141 Wash. 104, 250 P. 645 (1926), to a situation in which one is lawfully being arrested by a police officer. The *Miller* rule is that an accused assailant, in asserting self-defense, is entitled to rely upon his reasonable understanding of the circumstances. Under that rule, if a person reasonably but mistakenly believes himself to be in genuine danger of serious bodily injury, he may defend against that injury by the use of reasonable force, even though he is not truly in such danger. *Miller* was followed in *State v. Dunning*, 8 Wn. App. 340, 506 P.2d 321 (1973) and in *State v. Ladiges*, 66 Wn.2d 273, 401 P.2d 977 (1965), neither of which involved an arrest situation. We do not believe that the *Miller* rule should be extended to the situation of the resisting of a lawful arrest accomplished by the use of excessive force by a known police officer. Nor do we believe that there are *no* situations in which an arrestee may defend himself or a third party defend another against the use of excessive force by an officer. We have concluded that the best rule is one which is a middle ground between these two.

■ We hold, therefore, that in a lawful arrest neither the arrestee nor the bystander is entitled to rely upon appearances. A reasonable but mistaken belief that the arrestee was about to be seriously injured or that the arrestee was entitled to protect himself from such danger is insufficient. An arrestee's resistance of excessive force by a known police officer, effecting a lawful arrest, is justified only if he was actually about to be seriously injured. A bystander's interference with a lawful arrest accomplished by excessive force is justified only if the arrestee was in actual danger of serious physical injury. Each party acts at

his own peril, and if it is subsequently determined that the arrestee was not about to be seriously injured, neither his resistance nor third-party interference is justified. Of course, if resistance is justified, only force reasonable and necessary to protect the arrestee may be used against the officer.

The reason for our middle-ground rule is that under rare circumstances, not present here, the brutality may be so dangerous to the arrestee that his resistance or the intervention of others is necessary to prevent death or serious disability. We emphatically do not countenance a use of force by police which exceeds that essential to effect an arrest, but the arrestee's right to freedom from arrest without excessive force that falls short of causing serious injury or death can be protected and vindicated through legal processes, whereas loss of life or serious physical injury cannot be repaired in the courtroom. However, in the vast majority of cases, as illustrated by the one at bar, resistance and intervention make matters worse, not better. They create violence where none would have otherwise existed or encourage further violence, resulting in a situation of arrest by combat. Police today are sometimes required to use lethal weapons for self-protection. If there is resistance on behalf of the person lawfully arrested and others go to his aid, the situation can degenerate to the point that what should have been a simple lawful arrest leads to serious injury or death to the arrestee, the police or innocent bystanders. Orderly and safe law enforcement demands that an arrestee not resist a lawful arrest and a bystander not intervene on his behalf unless the arrestee is actually about to be seriously injured or killed.

We realize that there is no case law precisely in point upon the rule we have adopted. In *State v. Rousseau, supra,* the Supreme Court recognized that there is authority in other jurisdictions to the effect that, "even in the case of an unlawful arrest, the person arrested would be warranted in using force and inflicting personal injury upon the officer

only in self-defense, the necessity or apparent necessity for which must appear." *State v. Rousseau, supra* at 95. We submit that is not the rule of the *Rousseau* case nor is it the modern trend. The modern trend is expressed in the American Law Institute's Model Penal Code. Section 3.04 (2)(a)(i) of the Model Penal Code (U.L.A. 1974) provides that the use of force is not justified to resist an arrest which the arrestee knows is being made by a peace officer, although the arrest is unlawful. As we have indicated, our rule does not go as far as the Model Penal Code rule because we recognize that there are the rare occasions when there is an actual danger of serious injury or death to the arrestee.

We reiterate our belief that the rule regarding the right of the arrestee himself to resist excessive force in a lawful arrest situation should likewise be applied to a third party who intervenes in aid of such a person. Again we recognize that some other jurisdictions conflict with the modern trend. In this situation we see no difference in whether the arrest is lawful or unlawful. The third party is usually in no position to judge the initial legality of the arrest.

We hold that a bystander may not come to the aid of one being lawfully or unlawfully arrested by a uniformed police officer or one known or who should have been known to the bystander to be a police officer unless the arrestee was in actual danger of serious physical injury. Several elements, therefore, must be present before such a third person's assault of a police officer can be justified on the basis of defense of another. First, a third party may never intervene when the only threat to the arrestee is deprivation of his liberty by an arrest which has no legal justification. Aid is justified only if serious physical injury or death is threatened or inflicted. Second, the serious physical danger threatened or inflicted must be actual. A reasonable but mistaken belief that the arrestee was about to be seriously injured or that the arrestee was entitled to protect himself from such danger is insufficient. The third party acts at his

own peril and if it is subsequently determined that the arrestee was not about to be seriously injured, the third party's assault is not justifiable. Third, the physical injury must be serious, the police actions of the type which shock the conscience. Fourth, only force reasonable and necessary to protect the arrestee may be used against the officer. *See People v. Booher*, 18 Cal. App. 3d 331, 95 Cal. Rptr. 857 (1971); *and see People v. Young*, 11 N.Y.2d 274, 183 N.E.2d 319, 229 N.Y.S.2d 1 (1962).

 The challenged instruction on Westlund's right to self-defense accurately stated that he could resist only if he was about to be seriously injured by excessive use of force. The evidence shows Adams and Vonhof came to Westlund's aid before there was a danger of serious injury to him and therefore they are not entitled to an instruction on defense of another. Further evidence favorable to the defense clearly demonstrates that Westlund stated that he would peacefully accompany the officers, but he resisted restraint by handcuffs. The decision to use handcuffs must be a unilateral decision made by the arresting officer at the time of the arrest. It is not a decision subject to debate, negotiation or bargaining.

Turning now to another issue, the defendants objected numerous times throughout the 9-day trial to testimony by the officers and Westlund's neighbors relating to the atmosphere surrounding the party and the conduct of those in attendance who were not charged. These witnesses testified that there was a large number of people at the party, that most of those in attendance were drinking, that many of them hurled verbal insults and obscene language at the officers and that they struck and taunted the officers during the altercation.

 A defendant is not entitled to a perfect trial, and admission of testimony is within the sound discretion of the trial court. *State v. Golladay*, 78 Wn.2d 121, 470 P.2d 191 (1970); *State v. Miles*, 73 Wn.2d 67, 436 P.2d 198 (1968). Nevertheless, the record must be examined to insure that

irrelevant and inflammatory testimony tending to prejudice the defendant was not introduced. *State v. Miles, supra.*

■ Evidence is relevant if it is probative of a proposition provable in a case and if it throws any light on a contested matter. *State v. Schock,* 41 Wn.2d 572, 250 P.2d 516 (1952); *State v. Rook,* 10 Wn. App. 484, 519 P.2d 252 (1974). One of the contested matters in the case at bar was the reasonableness of the force which the officers used in arresting Westlund. The hostility of the crowd, the fact that they were drinking and the physical and verbal attacks upon the officers are all circumstances which are probative of the reasonableness of the officers' actions and might justify the use of a particular amount of force. The jury is entitled to a clear picture of the circumstances which the officers faced in attempting to make the arrest. The California Court of Appeals has addressed itself to this precise issue. In *People v. Booher, supra,* the defendant had gone to the defense of one who was participating in a demonstration and was being arrested by an officer. In answer to the defendant's contention that the officer's testimony as to obscenities mouthed by members of the crowd was irrelevant, the court aptly stated:

> The mood of the crowd as determined by the statements heard by the persons involved may well have been a part of the total circumstances bearing upon the reasonableness of the actions taken and the force used by the officers.

*People v. Booher, supra* at 337. *See also State v. Weiss,* 73 Wn.2d 372, 438 P.2d 610 (1968), where a defendant convicted of possession of marijuana challenged the introduction of testimony as to the conditions of his premises when he was arrested. The Supreme Court upheld the admission of this evidence, concluding that the jury was entitled to know the conditions of the scene of the crime.

Defendants also complain of the admission of a deputy sheriff's exclamation, made at the time of Westlund's arrest, "Look at the drugs." While it is true that the substance was never tested, the statement was introduced to

aid in answering an important question—did Westlund break away as contended by the officers or did they begin using force on him for no reason at all? The jury was entitled to hear the evidence in support of each version, and the statement was relevant to the reason for the altercation proffered by the State. The same may be said of the testimony as to minors drinking at the party; it was clearly relevant to the legality of Westlund's arrest.

The relevancy of evidence, however, must be balanced against any inflammatory effect it might have on the jury. If the relevance is remote and of little necessity and is engulfed by prejudicial effect, the evidence will not be admissible. *State v. Golladay, supra*. In the case at bar, the relevancy was not remote; the testimony went to the heart of the questions facing the jury. Any possible prejudice resulting from the nature of this testimony was clearly outweighed by its relevancy. The balancing process is within the sound discretion of the trial court, *State v. Adams*, 76 Wn.2d 650, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971), and the discretion was not abused here.

Defendants also assert that a fair trial was not had because of the conduct of police officers during the course of the trial. There is indication in the record that at least two police officers, including two involved in Westlund's arrest, took approximately eight pictures of spectators, witnesses and defense counsel's wife in the hallway outside the courtroom. The record does not reflect whether the officers were uniformed. The record also shows that defense counsel stated to the judge that "it had come to his attention" that a well known narcotics agent was in the courtroom, whispering to other officers and pointing to some of those in the courtroom.

We condemn this conduct by law enforcement officers. Such actions amounted to unjustifiable gambling with the defendants' rights to a fair trial. We conclude, however,

that this conduct does not constitute reversible error. First, the trial court has wide discretionary powers in conducting a trial and dealing with irregularities which arise. *State v. Swenson*, 62 Wn.2d 259, 382 P.2d 614 (1963). In the case before us, when the matter of the pictures came to the attention of the court and prosecutor, the allegations were investigated, and the following day the prosecutor agreed to turn over the film to the court. That was promptly done and the film subsequently given to defense counsel. Any witness who could have been intimidated by the picture taking could then be assured that no prints would be available to the police or court. In response to defense counsel's statement concerning the narcotics officer, the prosecutor stated that "he is listed as a witness and he has stayed out of the courtroom." No further mention is made of the officer's presence.

Second, unless the irregular incidents are of a number and magnitude that they are per se unfair, that is, prejudice undoubtedly resulted, some showing of actual prejudice is required. *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507, 1517 (1966). In the case at bar, the conduct unquestionably did not reach the magnitude of errors in *Sheppard*, where a variety of untoward behavior was manifested by the court, media and prosecutor. Nor does the record reflect per se prejudice such as that shown in *State v. Swenson, supra*, where defense counsel's cross-examination was stifled by the court's expression of concern for the key witness who was pregnant and by the fact that the witness was at times physically unable to continue her testimony. Here, though the trial judge said that he could do nothing about picture taking of spectators, both before and after the film was given to defense counsel, he stated that appropriate action would be taken if it was brought to his attention that a witness was being or felt intimidated. No further pictures were taken. There was no showing that any witness actually felt intimidated or changed his testimony as a result of any of the alleged actions of the

officers. Nor is there evidence that any misconduct was committed in the presence of the jury. While we do not condone such conduct, an unsubstantiated allegation of intimidation cannot form a basis for holding that the defendants were denied a fair trial.

Judgment affirmed.

PEARSON and PETRIE, JJ., concur.

Petition for rehearing denied June 9, 1975.

Review denied by Supreme Court July 29, 1975.